**HENNING v. UNITED STATES et al.**

Civ. A. No. 7917.

United States District Court
D. Massachusetts.

Oct. 17, 1950.

Frederick Breen, Boston, Mass., for plaintiff.

George F. Garrity, U. S. Atty., Philip T. Jones, Asst. U. S. Atty., for defendant.

Richard H. Lee, Blakemore & Lee, Boston, Mass., for Bessie M. Henning.

WYZANSKI, District Judge.

A jury having been waived, I shall dictate my findings and conclusions.

The question at issue in this case is who, if anyone, shall receive the proceeds of a policy of national life insurance for $10,000 issued on the life of Eugene C. Henning, a service man, who died on active service on July 4, 1945.

There are three principal claimants:— first, the claim of the representative of the father of the service man; second, the claim of the mother of the service man; and third, the claim of the representative of the stepmother of the service man. In one sense this first claim just referred to has not been formally presented to the Court because there is not now living any representative or any administrator d. b. n. p. a., of the deceased father of the service man. However, I deem it appropriate, in view of the form of judgment which must be entered in this case, to take that claim into account as though it were presented and to give a reasonable period of time for application to be made to the Probate Court of Massachusetts for the appointment of such an administrator d. b. n. p. a., and to allow such person, if appointed, to file a formal pleading in this Court prior to the entry of a judgment.

In stating the facts it will be most convenient first to point out that after Eugene died in active service on July 4, 1945, his father, Otto, died on December 8, 1945, and his stepmother died on June 30, 1949. I have already pointed out that there was a problem with respect to the representative of Otto. Although after his death his widow, Bessie, was named as administratrix, she died on June 30, 1949, before she had fully administered the estate.

With regard to the claim of the stepmother, Bessie, it is important to recognize that she herself died on June 30, 1949. A Mr. Kennedy was appointed and is still serving as the administrator of her estate, but has not yet filed an amended claim, but it is understood that such a claim will be duly pleaded within the next forty eight hours and I shall regard the pleading as though it had been filed before I dictated this memorandum.

It now is appropriate to turn to the facts with regard to the service man's relationship to the three persons, the father, the mother and the stepmother, who either through themselves or their representatives have presented or will present claims to this Court. Eugene Charles Henning was born September 20, 1912. He was the son of Otto F. Henning and Clara Belle Henning. They seem to have separated at the time of his birth. At any rate between 1912 and about 1920 the service man and his mother lived together in the home of the maternal grandmother. During this time the support of the service man devolved entirely upon the maternal side of the family.

About 1920, when the service man was about eight years of age, he went to the home of his paternal grandmother, Mrs. Henning. While he was with her she received from his mother for his account some financial assistance. I am not in-

clined to believe that it was quite so much as $100 a year which the mother says that she gave to her mother-in-law, but I do not regard this as a very material point.

About 1922 the service man moved to the home of a cousin on the Henning side of the family named at that time Mrs. Schacht, now known as Mrs. Schaller. The service man lived with Mrs. Schacht from the day before Thanksgiving of 1922 until about the fall of 1926.

While the service man was at his maternal grandmother's home on February 8, 1923 his father, Otto, and his mother, Clara Belle, were divorced by a decree of the Probate Court of Norfolk County in the Commonwealth of Massachusetts. It was one of the provisions of the decree that the care and custody of Eugene Henning were awarded to the father, Otto Henning. Four years later while the service man was at the home of Mrs. Schacht, on September 3, 1927, his father Otto F. Henning, married Bessie M. Henning formerly known as Bessie M. Gass.

When Eugene was about fifteen years of age he went to live with his father and his stepmother in Dedham. While he was there his stepmother treated him with all the customary affection and attention that a mother would bestow on a natural child. She took care of his personal effects, did his laundry and furnished his meals which were no doubt paid for largely by the father. While Bessie did not call the service man a "son" or demonstrate her affection by kisses, none the less the relationship was reasonably close. No hostility at any time so far as the evidence indicates existed between the boy and his stepmother.

About 1930 the service man moved from the house of his father and stepmother to a boarding house run by a Mrs. Wilson. So far as appears there was no friction at home which caused him to move. He apparently chose to live in a boarding house with a friend, a Mr. James T. Shaw, who was working in the same enterprise with himself, the service man being an employee of Shaw's father and being an assistant to Shaw himself.

After about two years both the service man and Shaw went to the home of Otto and Bessie, the father and stepmother of the service man. The pleasant relationship which had characterized the service man's earlier occupancy of that home continued at the time of his second occupancy.

On January 27, 1940, the service man married Mabel Evelyn Hathaway. They lived together until November 11, 1942, when the service man entered upon active duty in the United States Navy.

After he entered the Navy the service man corresponded with his natural mother, sent her presents and sent her photographs of himself on active duty.

On December 1, 1942, the service man received a policy of national life insurance of $10,000. He originally named as beneficiaries his wife, Mabel Henning, and his father, Otto Henning, as contingent beneficiary. On July 27, 1944, Eugene C. Henning executed a change of beneficiaries, naming only his father, Otto F. Henning, as beneficiary. On October 16, 1944, the marriage of Eugene C. and Mabel H. Henning was dissolved by decree of the Probate Court for Norfolk County. On July 4, 1945, Eugene C. Henning died on active service.

 I conclude as a matter of law that at the time of his death Eugene C. Henning left him surviving three persons each of whom was a "parent" within the meaning of Section 801(f) of Title 38, United States Code Annotated. Obviously the father, Otto, at that time was a "parent." He was the natural father and he had supported the boy, at least in part, up until his twenty-first year. The natural mother, Clara Belle Henning, was also a "parent" within the meaning of the statute. Once one is a natural parent, he or she continues to be such for statutory as well as for other purposes regardless of whether the natural parent does or does not contribute to the support of the child, does or does not discipline the child, is or is not fond of the child, does or does not desert the child. A person once tied by blood as a parent to a child always remains a par-

ent. Such a person is a parent "first", "*last*" and all the time.

■ The problem with respect to the stepmother, Bessie, is somewhat more complicated. She of course is not a natural parent. She, however, stood in loco parentis during the period of time that Eugene was a minor and as long as it was possible for anybody to stand in loco parentis, that is, until Eugene reached the age of twenty-one. There is no difficulty in a person being in loco parentis, even though a natural parent or two natural parents are alive. This statute gives rights to a person "who last bore" the status of being in loco parentis. At the critical moment, when Eugene became twenty-one, three people stood in loco parentis, one on the basis of both blood and conduct, a second on the basis primarily of blood, and a third, solely on the basis of conduct. All three have the statutory standing necessary to be considered.

In the light of this determination and bearing in mind the fact that Otto F. Henning, the father, was named as beneficiary and continued to survive for some five months after the death of Eugene, I direct that a decree shall be drawn awarding sums due from July 4, 1945 to December 8, 1945 to the representative of the father, Otto F. Henning; sums due from December 9, 1945 to June 30, 1949, equally to the representative of the stepmother, Bessie, and the mother Clara, and payments due since July 1, 1949, to the mother Clara alone.

■ I have not overlooked in this direction Section 802(j) of Title 38 which purports to cover the situation where a beneficiary under a policy dies after payment is due but before it is paid. Taking into account the reason of the matter and the decision in Baumet v. United States, 2 Cir., 177 F.2d 806, I conclude as a matter of law that the critical point in determining whether a beneficiary or a representative is entitled to take is whether the beneficiary was alive on the date the payment was due. It would be monstrous to give to the Veterans' Administration the power never to pay an insurance policy merely by holding up payments already due until such time as the named beneficiary or the statutory beneficiary dies. This case serves as an admirable illustration, not of any wrong-doing on the part of the Veterans' Administration, but of the injustice which would follow if the contention which the Government makes were to prevail. Here the stepmother, Bessie, was diligent in presenting her case. Opposition to her, not without reason in view of my opinion, was made by the natural mother. The Veterans' Administration being faced with these conflicting claims refused payment and the matter came before this Court for adjudication. Efforts at a settlement were made. Such efforts failed. In the meantime Bessie died and now the Government suggests that not only Bessie cannot take because she died, but those who are her representatives cannot take and the money remains in the Treasury of the United States. A mere statement of the problem makes it plain that the Government cannot in equity or in law prevail.

A decree is to be drawn in accordance with this opinion, due provision to be made, if possible by agreement, with respect to counsel fees. In the event of failure to agree, application is to be made to the Court.